## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMINE TOUARSI,** | |
| Plaintiff, | |
| v. | Case No. 13-cv-01105 (CRC) |
| **UNITED STATES DEPARTMENT OF JUSTICE, <u>et al.</u>,** | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Fifteen years ago, Plaintiff Amine Touarsi was detained by immigration agents on suspicions of terrorism while he was in the United States awaiting a decision on his application for political asylum from Algeria. After being held for over a year, Touarsi was granted asylum and released without ever being charged with a crime. He has since become a U.S. citizen. Touarsi contends that his detention was unjustified and that federal law enforcement continues to hound him without cause. Seeking to establish government misconduct, Touarsi filed a Freedom of Information Act request with the Federal Bureau of Investigations for records regarding his arrest and detention. The Department of Justice ("DOJ") and other relevant agencies provided Touarsi roughly 200 pages of records in response to his request but withheld approximately 350 other pages under various FOIA exemptions. Touarsi now brings suit to challenge the government's response. He does not dispute the adequacy of the government's search for records, but he contends that nearly every aspect of the government's decision to withhold records was improper, and he demands production of the withheld materials, expungement of his records, and attorney's fees. Without expressing judgment on the merits of Touarsi's complaints of mistreatment, the Court concludes that the agencies have adequately justified their FOIA withholdings and therefore will grant summary judgment in favor of the government.

## I.        Background

Amine Touarsi fled Algeria and applied for political asylum in the United States in 1996, claiming that extremist groups had targeted him because of his political associations.  Affidavit of Amine Touarsi ("Touarsi Aff.") ¶¶ 3–4.  Three years after his arrival in the U.S., Immigration and Naturalization Service agents detained Touarsi upon suspicions that he was connected to a terrorist plot and held him in various detention facilities over the next year.  Id. ¶¶ 3, 9–17.  An Immigration Judge denied Touarsi's asylum application while he was detained, but Touarsi successfully appealed that decision to the Board of Immigration Appeals, obtained asylum, and was released.  Id. ¶¶ 18–20.  According to Touarsi, the media reported on his detention at the time and published his full name.  Id. ¶¶ 6–8.  Since his release, Touarsi claims that federal agents offered him an early green card in exchange for his becoming an informant, which he refused.  Id. ¶¶ 22–23.  Touarsi further alleges that he is questioned extensively whenever he returns to the United States from traveling abroad, that he lost a job as a taxi driver because his license was denied due to his detention, and that he "feel[s] like [he is] constantly under surveillance and cannot live a normal existence."  Id. ¶¶ 25–36.

Seeking to learn more about the reasons for his arrest and detention, in March 2012 Touarsi submitted a FOIA request to the FBI for:

a.  All records related to Mr. Touarsi's arrest and detention in 1999 through 2001.
b.  All records related to Mr. Touarsi created and/or kept by the FBI.
c.  All records related and relied upon on the investigation and the arrest of Mr. Touarsi.  This includes, but [is] not limited to the outcome of the investigation and the release.
d.  All records related to Mr. Touarsi's surveillance by law enforcement since 2001.
e.  All records related to the FBI's visit to Mr. Touarsi in 1997 to offer him a Green Card in exchange for being an informant.
f.  All records and documents related to investigations, reports, and conclusions concerning Mr. Touarsi in the possession of the FBI.

Declaration of David M. Hardy, Section Chief in the FBI Records Management Division, ("Hardy Decl.") ¶ 61.  In response to this request, the FBI searched its central records system and found a main investigative file associated with Touarsi and other individuals, from which it reviewed 85 pages directly related to Touarsi and released 56 pages to him in part or in whole.  Id. ¶¶ 7–9.

After an unsuccessful administrative appeal, Touarsi filed this lawsuit.  Id. ¶¶ 15–16.  In response, the FBI again searched its central records system and found an additional 291 pages of responsive records, of which it released 123 pages in full or in part, referred five records to Immigration and Customs Enforcement ("ICE") for review, and referred 124 pages to Customs and Border Protection ("CBP").  Id. ¶¶ 16, 108–09.  The FBI also searched its electronic surveillance indices, which uncovered no further responsive records.  Id. ¶¶ 15–16.  ICE released in part and withheld in part the five pages it received from the FBI.  Declaration of Louis Todd Fuss, ICE Supervisory Paralegal Specialist ("Fuss Decl.") ¶ 7.  CBP released in part seven pages and requested the FBI withhold the remaining referred pages on CBP's behalf.  Declaration of Shari Suzuki, CBP FOIA Appeals Officer ("Suzuki Decl.") ¶ 14.  The FBI, CBP, and ICE relied on FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E) to withhold the records.  Hardy Decl.  ¶ 16; Suzuki Decl. ¶ 14; Fuss Decl. ¶ 9.

## II.      Standard of Review

Congress created FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Am. Civil Liberties Union v. DOJ, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting U.S. Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976)).  Despite this broad mandate, FOIA contains a set of exemptions to the general obligation to provide government records to the public.  5 U.S.C. § 552(b).  These exemptions are in place "to balance the public's interest in governmental transparency against the "'legitimate governmental and private interests [that] could be harmed by release of certain types of information.'"  United Techs. Corp. v. DOD,

601 F.3d 557, 559 (D.C. Cir. 2010) (quoting Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992) (*en banc*)).  FOIA "mandates a strong presumption in favor of disclosure," and its "statutory exemptions, which are exclusive, are to be narrowly construed[.]"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quotations omitted).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  In deciding a motion for summary judgment, the Court assumes the truth of the non-movant's evidence and draws all reasonable inferences in the non-movant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The government bears the burden to establish that the claimed exemptions apply to each document for which they are invoked.  Am. Civil Liberties Union v. DOD, 628 F.3d 612, 619 (D.C. Cir. 2011).  The government may satisfy this burden through declarations that describe the justifications for its withholdings in "specific detail, demonstrate[ing] that the information withheld logically falls within the claimed exemption[.]"  Id.  The agency's affidavits will not be sufficient to warrant summary judgment if the plaintiff puts forth contrary evidence or demonstrates the agency's bad faith.  Id.  When the government raises national security objections to disclosure, courts in this circuit "consistently defer to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review" of the government's justifications for withholding.  Ctr. For Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 927 (D.C. Cir. 2003) (citations omitted).

### III.    Analysis

Touarsi has not disputed the adequacy of DOJ's search for responsive records.  Rather, he challenges the agencies' Vaughn index and their justifications for the withholdings under

Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E).   He also asks the Court to expunge records related to him and award attorney's fees.   The Court will address each of Touarsi's complaints in turn.

A. Vaughn Index

FOIA requires an agency to provide the requestor with a description of each withheld document along with an explanation for the agency's nondisclosure.   Oglesby v. U.S. Dep't of the Army, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (citing King v. DOJ, 830 F.2d 210, 224 (D.C. Cir. 1987)).   "The description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection." Id.  These requirements stem from the D.C. Circuit's ruling in Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

In this case, the responding agencies created categories of withheld records based on each document's content and the applicable exemption.   E.g., Hardy Decl. ¶¶ 31–33.   They then marked these codes on "deleted page sheets" when a page was withheld in whole or next to the portion of a page that was withheld in part.   Id.   The declarations accompanying the government's summary judgment motion  describe the categories of information that were withheld under each exemption and the agencies' reasoning for the withholding.   See generally Hardy Decl.; Suzuki Decl.; Fuss Decl.  This general practice is regularly accepted by members of this court and is not, in and of, itself, a legally insufficient means of satisfying an agency's Vaughn obligations .   See, e.g., Citizens for Responsibility & Ethics in Washington v. DOJ, 746 F.3d 1082, 1088 (D.C. Cir. 2014) ("'the government need not justify its withholdings document-by-document; it may instead do so category-of-document by category-of-document, so long as its definitions of relevant categories are sufficiently distinct to allow a court to determine whether the specific claimed exemptions are properly applied'" (quoting Gallant v. NLRB, 26 F.3d 168, 173 (D.C. Cir. 1994))); Keys v. DOJ, 830 F.2d 337, 349–50 (D.C. Cir. 1987) (addressing coding format nearly identical to the one at

issue here) (citing <u>Donovan v. FBI</u>, 806 F.2d 55, 58–59 (2d Cir. 1986)).  Accordingly, the Court will not require the agencies to justify their withholdings document-by-document and will instead review their justifications for each category in the context of the specific exemptions applied.

    B.  <u>Exemption 1</u>

Exemption 1 protects from disclosure documents that are properly classified under an Executive Order "in the interest of national defense or foreign policy[.]"  5 U.S.C. § 552(b)(1). Documents may be classified under Executive Order 13,526 by an "original classification authority" if the information pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology" and "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security[.]"  Exec. Order 13,526, 75 Fed. Reg. 707, 707 (Dec. 29, 2009). The Supreme Court has defined "intelligence sources and methods" broadly to encompass "all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence[,]" including the "broad power to protect the secrecy and integrity of the intelligence process."  <u>CIA v. Sims</u>, 471 U.S. 159, 169–70 (1985).  The FBI's declarant, David M. Hardy, who is an original classifying authority, states that the FBI withheld "detailed intelligence activity information gathered or compiled by the FBI on a specific individual or organization of national security interest;"[1] the "focus and character or title of a case;" and "FBI file numbers assigned to specific intelligence activities, including channelization and dissemination instructions."  Hardy Decl. ¶¶ 2, 37–46.

---

[1]  The FBI has also withheld some of the same documents under Exemption 3 pursuant to the National Security Act, 50 U.S.C. § 3024(i)(1).  Because the Court determines that the information is properly withheld under Exemption 1, it need not address whether it is separately protected by Exemption 3.

According to Touarsi, the FBI's description of the documents is insufficient to analyze whether the information relates to intelligence methods or would harm national security if revealed. Pl. Mem. at 16.  While the Bureau may not rely on a "categorical description of redacted material[,]" Campbell v. DOJ, 164 F.3d 20, 30 (D.D.C. 1998) (quotations omitted), it must disclose only "as much information as possible without thwarting the exemption's purpose."  King, 830 F.2d at 223.  Hardy's declaration explains that revealing methods of intelligence gathering could enable entities and individuals to better hide malicious activities from investigation.  Hardy Decl. ¶¶ 41–43.  And revealing specific information uncovered by an investigation method can likewise reveal the method itself.  Id.  The government has also submitted materials in camera that provide further justifications for its withholdings.  Having reviewed these materials,[2] the Court agrees that the only additional information the FBI could plausibly provide would disclose the very intelligence methods the government seeks to protect.  See, e.g., Shapiro v. DOJ, No. 13-cv-595, 2014 WL 953270, at *10 (D.D.C. Mar. 12, 2014) (FBI not required to explain details of "intelligence sources and methods" withheld pursuant to Exemption 1 where doing so would reveal protected information).  Hardy's justification for the withholdings, coupled with the government's in camera submissions, provides sufficient explanation of the potential harms of disclosure to warrant granting summary judgment for the government on this issue.  See Ctr. For Nat'l Sec. Studies, 331 F.3d at 927 (court accords great deference to agencies tasked with national security and law enforcement in determining whether to disclose certain information).

---

[2] Touarsi asks that the Court reject DOJ's request to submit documents in camera until the government has submitted a legally sufficient Vaughn index. Pl. Mem. at 30–31.  As stated above, however, the government has provided a sufficiently detailed description of withheld materials.  In any event, the Court, in its discretion, finds that the provided materials were appropriately submitted in camera.  See Ray v. Turner, 587 F.2d 1187, 1195 (D.C. Cir. 1978) (court has discretion to make in camera inspection of documents under FOIA).

Touarsi further contends that because he has never been charged with a crime, any information in his records must not compromise national security.  Pl. Mem. at 16.  But whether or not Touarsi has committed a crime does not alter the FBI's ability to protect its intelligence sources and methods.  Lastly, Touarsi takes issue with the FBI's Exemption 1 withholdings because he received several pages that were partially redacted under Exemption 1 but that are marked "unclassified" and have the word SECRET crossed out.  Def. Mem. at 16.  In a supplemental declaration, however, Mr. Hardy explains that these markings were made *after* the redactions to make clear that the information that was provided to Touarsi is not classified.  Second Hardy Decl. ¶ 4.  Accordingly, the FBI has adequately justified its withholding of records under Exemption 1.

### C.  Exemption 5

FOIA Exemption 5 covers "inter-agency or intra-agency memorandums or letters which would not be available by law . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  This means, in effect, privileged documents that originated with the agency.  U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).  Here, the government invoked the attorney-client privilege as to some documents and the deliberative process privilege as to others.  Touarsi challenges both privileges, arguing that the government must reveal the withheld material because it has engaged in misconduct.

### i.  Misconduct

Touarsi asks the court to waive the attorney-client and deliberative process privileges because he believes the government has engaged in misconduct related to his investigation and detention.  Pl. Mem. at 21–22.  There is a "presumption of legitimacy accorded to the Government's official conduct[,]" which may only be overcome by "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 174 (2004) (citing U.S. Dep't of State v. Ray,

8

502 U.S. 164, 178–79 (1991)); accord Boyd v. DOJ, 475 F.3d 381, 388 (D.C. Cir. 2007)

("Unsubstantiated assertions of government wrongdoing . . . do not establish 'a meaningful

evidentiary showing.'" (quoting Favish, 541 U.S. at 175)).

Touarsi describes various activity that he contends constitutes government impropriety.

Touarsi claims that because he was never prosecuted, his detention and investigation necessarily

were improper.  Pl. Mem. at 21–22.  But the government may have decided not to prosecute Touarsi

for any number of reasons, and its decision is not evidence that it lacked a basis to investigate him

in the first instance.  Despite Touarsi's contention that FBI agents have been harassing him for

years, id. at 24, his affidavit does not describe any specific instances of misconduct.  He states that

he and his friends have been questioned by the FBI many times, that he is interrogated whenever he

returns to the country from travel abroad, and that his taxi cab license was not renewed after a

background check.  Touarsi Aff. ¶¶ 29–35.  None of this activity as described, however, raises a

reasonable inference of improper or illegal conduct.  Touarsi likewise does not explain why it

would be misconduct for federal agents to offer to help expedite his obtaining a green card if he

would act as an informant.  Id. ¶ 23.  Nor does he establish what improper motive the government

might have to continue to investigate him—if indeed that is the case—asserting only that it is

"plausible" that it is trying to avoid disclosing evidence of misconduct.  Id.  But Touarsi cannot

obtain otherwise-privileged records unless he provides actual evidence that could raise a reasonable

inference of wrongdoing.  See Favish, 541 U.S. at 174.  Because he has not done so, the Court will

not require the government to disclose validly withheld records.

## ii.  Attorney-Client Privilege

The attorney-client privilege protects confidential communications from clients to their

attorneys made for the purpose of securing legal advice or services.  In re Sealed Case, 737 F.2d 94,

98–99 (D.C. Cir. 1984).  The privilege also protects communications from attorneys to their clients

if the communications "rest on confidential information obtained from the client." Id. at 99.  In the governmental context, the "client" may be the agency and the attorney may be an agency lawyer. Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997).  DOJ has asserted the attorney-client privilege to withhold legal advice from FBI attorneys to government agents and employees concerning investigation strategies and a potential prosecution.  Hardy Decl. ¶ 57.  On its face, this type of information is protected by the privilege.

Touarsi attempts to challenge the FBI's assertion of the privilege by first contending that the Bureau must provide a "description of the legal advice sought" to demonstrate that the withheld material is privileged.  Pl. Mem. at 18–19.  But requiring the Bureau to divulge details of the communications beyond their general subject matter—a criminal investigation and potential prosecution—is not necessary for the Court to determine whether the information is privileged and would invade the very privilege itself.  Second, Touarsi asks for the names of the FBI counsel involved in these communications and "exactly who the client seeking the advice is." Id.  Absent a showing of bad faith or contrary evidence, however, the Court has no reason to disbelieve Hardy's declaration that the parties to these communications were government attorneys and their clients. See, e.g., Am. Civil Liberties Union, 628 F.3d at 619 (agency affidavits accepted as true absent contrary evidence or indicia of bad faith).  Third, Touarsi claims the FBI has not affirmatively proven that "these communications were treated in a confidential manner."  Pl. Mem. at 19.  The Hardy declaration, however, expressly states that the communications "were made in confidence [and] were not shared with or circulated to individuals outside the attorney-client relationship." Hardy Decl. ¶ 57.  Finally, Touarsi posits that if the communications were "merely authoritative interpretations of agency law" then they are not protected by the attorney-client privilege.  Pl. Mem. at 19.  But, again, the Hardy declaration makes clear that the communications related to a specific

investigation and potential prosecution.  For all these reasons, the Court will not upset the

government's assertions of the attorney-client privilege.

### iii.  Deliberative Process Privilege

Exemption 5 also encompasses the deliberative process privilege.  NLRB v. Sears, Roebuck

& Co., 421 U.S. 132, 150 (1975); Public Citizen, Inc. v. OMB, 598 F.3d 865, 874 (D.C. Cir. 2010).

To qualify for the privilege, a document must be both "predecisional," meaning it was made before

the "adoption of an agency policy," Judicial Watch, Inc. v. FDA, 449 F.3d 141, 151 (D.C. Cir.

2006) (internal quotation marks omitted), and "deliberative," meaning it makes "recommendations

or express[es] opinions on legal or policy matters[,]" Judicial Watch of Florida, Inc. v. DOJ, 102 F.

Supp. 2d 6, 12 (D.D.C. 2000) (citing Vaughn, 523 F.2d at 1144).

Here, CBP withheld one of its officer's handwritten notes, taken when Touarsi returned to

the United States from a trip abroad.  See Suzuki Decl. ¶ 17.  CBP contends the notes are

predecisional and deliberative because they reflect "the CBP Officer's thought process regarding

how the traveler was processed" and because they would reveal how the officer prioritized facts and

"his interpretation of certain data."  Id.  An individual government officer's notes may constitute

deliberative documents if they are used to assist the decisionmaking process.  See, e.g., Baker &

Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 321 (D.C. Cir. 2006) ("notes taken by

government officials often fall within the deliberative process privilege") (citing Coastal States Gas

Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) (deliberative process privilege

protects "subjective documents which reflect the personal opinions of the writer rather than the

policy of the agency")); Judicial Watch of Florida, 102 F. Supp. 2d at 14 (Attorney General's notes

to himself protected).[3]

---

[3]  Touarsi also contends that the government must segregate and disclose non-privileged factual
information within a document otherwise protected by the deliberative process.  Pl. Mem. at 17.

Touarsi contends that the officer did not make deliberative decisions because processing travelers at the border is a routine event, and Touarsi is routinely detained for several hours whenever he returns from abroad.  Pl. Mem. at 20.  The deliberative process privilege, however, "protect[s] materials that concern individualized decisionmaking" as well as "the development of generally applicable policy" and thus protects routine decisionmaking.  Hinkley v. United States, 140 F.3d 277, 284 (D.C. Cir. 1998) (citing Mapother v. DOJ, 3 F.3d 1533, 1537–40 (D.C. Cir. 1993)); accord Hamilton Sec. Grp. Inc. v. HUD, 106 F. Supp. 2d 23, 32 (D.D.C. 2000), aff'd sum nom., No. 00-5331, 2001 WL 238162 (D.C. Cir. Feb. 23, 2001) (rejecting argument that document was not protected by deliberative process privilege because it was created "in the routine course of business").  Accordingly, the Court determines that CBP has adequately justified withholding the officer's notes under the deliberative process privilege.

D.  Exemptions 6 and 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]"  5 U.S.C. § 552(b)(6).  "Exemption 6 is designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature[.]"  Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 875 (D.C. Cir. 1989) (citing U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 600 (1982)).  Exemption 7(C) similarly protects "information compiled for law enforcement purposes" to the extent it "could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]"  55 U.S.C. § 552(b)(7(C).  In applying both exemptions, courts "weigh the 'privacy

---

The Suzuki declaration establishes, however, that all reasonably segregable information has been released.  Suzuki Decl. ¶ 34.  As explained in greater detail below, this declaration satisfies the agency's obligation to demonstrate that it adequately segregated non-exempt material.  Moreover, the government need not disclose factual information contained in deliberative records to the extent it would "reveal the government's deliberations."  In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997).

interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy.'" Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999) (quoting Nat'l Ass'n of Retired Fed. Emps., 879 F.2d at 874); accord DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762 (1989) (applying Exemption 7(C)). "On the privacy side of the ledger, [courts] have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants." Schrecker v. DOJ, 349 F.3d 657, 661 (D.C. Cir. 2003). This type of third-party information is "categorically exempt" from disclosure under Exemption 7(C) in the absence of an overriding public interest in its disclosure. Nation Magazine, Wash. Bureau v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995). In analyzing the public's interest, the inquiry "should focus not on the general public interest in the subject matter of the FOIA request, but rather on the incremental value of the specific information being withheld." Schrecker, 349 F.3d at 661.

Invoking Exemptions 6 and 7(C), the FBI withheld the names and personal information of government personnel and third parties who were involved in the investigation of Touarsi's possible connection to a terrorist plot, either as suspects, investigators, or sources of information. Hardy Decl. ¶ 32. Touarsi contends that there is a substantial public interest in assessing whether institutions like the FBI are properly carrying out their statutory duties, Pl. Mem. at 23–24, but he does not explain why learning these names will help the public understand government activities. Reciting FOIA's general goal of government oversight is insufficient to obtain the names of individuals contained in law enforcement records. See Schrecker, 349 F.3d at 661 (general public interest in reviewing government activity insufficient to justify revealing personal information); Am. Immigration Lawyers Ass'n v. Executive Office for Immigration Review, No. 13-cv-00840 (CRC), 2014 WL 7356566, at *3–5 (D.D.C. Dec. 24, 2014) (same). The government serves the

interest Touarsi articulates by providing the documents associated with his investigation more generally, to the extent they may be disclosed under FOIA's exemptions.  See, e.g., McCutchen v. U.S. Dep't of Health & Human Servs., 30 F.3d 183, 188 (D.C. Cir. 1994) ("A mere desire to review how an agency is doing its job, coupled with allegations that it is not, does not create a public interest sufficient to override the privacy interests protected by Exemption 7(C).").  Touarsi thus has failed to demonstrate any exceptional circumstance warranting the release of private information that is ordinarily withheld in FOIA cases.

E.  Exemption 7(D)

FOIA Exemption 7(D) protects law enforcement records that "could reasonably be expected to disclose the identity of a confidential source" as well as information furnished by the source on a confidential basis.  5 U.S.C. § 552(b)(7)(D).  "A source is confidential within the meaning of [E]xemption 7(D) if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"  Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (per curiam) (quoting DOJ v. Landano, 508 U.S. 165, 170–74 (1993)).  There is no general "presumption that a source is confidential within the meaning of [FOIA] Exemption 7(D) whenever [a] source provides information [to a law enforcement agency] in the course of a criminal investigation."  Landano, 508 U.S. at 181.

The FBI withheld the permanent "symbol designations" of, and the information provided by, informants who it contends were given an express assurance of confidentiality.  Hardy Decl. ¶¶ 94, 98.  Touarsi claims that DOJ must disclose redacted confidentiality agreements in order to establish that the informants were in fact given express assurances.  Pl. Mem. at 27.  The Hardy declaration, however, explains that the FBI only assigns symbol designations to informants who are given express assurances of confidentiality, and that each of these informants has been assigned such a designation.  Hardy Decl. ¶ 98.  This declaration is sufficient to establish that each source is

confidential.  Skinner v. DOJ, 744 F. Supp. 2d 185, 215 (D.D.C. 2010) (The government may

demonstrate that a particular source was given an express assurance of confidentiality by showing

that it was agency practice to do so for informants given symbol numbers).[4]

      F.  Exemption 7(E)

Exemption 7(E) protects law enforcement records that "would disclose techniques and

procedures for law enforcement investigations . . . if such disclosure could reasonably be expected

to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  "[A] highly specific burden of showing

how the law will be circumvented" is not required; instead, "exemption 7(E) only requires that [the

agency] 'demonstrate[] logically how the release of [the requested] information might create a risk

of circumvention of the law.'"  Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009)

(quoting PHE, Inc. v. DOJ, 983 F.2d 248, 251 (D.C. Cir. 1993)).  "While Exemption 7(E)'s

protection is generally limited to techniques or procedures that are not well-known to the public,

even commonly known procedures may be protected from disclosure if the disclosure could reduce

or nullify their effectiveness."  Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec.,

852 F. Supp. 2d 66, 78 (D.D.C. 2012) (citing among others Judicial Watch, Inc. v. U.S. Dep't of

Comm., 337 F. Supp. 2d 146, 181 (D.D.C. 2004)).

Here, the agencies withheld various categories of records based on different justifications.

The FBI withheld techniques and procedures used in investigating Touarsi because, according to

the Bureau, revealing this information would disclose what circumstances trigger the Bureau's use

of a particular investigatory technique.  Hardy Decl. ¶ 101.  It also withheld the locations and

identities of FBI units connected to particular investigations under the theory that revealing this

---

[4]  The FBI also withheld the name of and information provided by a source it contends was given an *implied* assurance of confidentiality as well as law enforcement officials who themselves provided information gained from an informant.  Hardy Decl. ¶¶ 90–93.  Because this information was also withheld under Exemptions 1, 6, 7(C), and 7(E), Second Hardy Decl. ¶¶ 8–9, the Court need not determine whether it may also be withheld under Exemption 7(D).

information would enable individuals to determine where the Bureau has directed its investigatory resources.  Id. ¶ 103.  CBP withheld computer codes and designations from its records because release of this information would make it easier for individuals to gain unauthorized access to, and manipulate, CBP electronic files.  Suzuki Decl. ¶ 32.  And both agencies, along with ICE, withheld search results from various electronic databases used in investigations, contending that revealing the manner in which they are searched would enable individuals to circumvent identification.  Hardy Decl. ¶ 102; Suzuki Decl. ¶ 33; Fuss Decl. ¶ 21.  These descriptions adequately explain that the information withheld constitutes law enforcement techniques and methods and how revealing this information could reduce their effectiveness.  See, e.g., Skinner, 744 F. Supp. 2d at 215 (withholding under exemption 7(E) is proper if disclosure would help "'potential criminals predict future investigative actions by the FBI and consequently employ countermeasures to neutralize those techniques'" (quoting Perrone v. FBI, 908 F. Supp. 24, 28 (D.D.C. 1995))).[5]

G.  "Missing" Responsive Documents

Touarsi contends that the FBI has failed to explain in the Hardy Declaration why 116 pages were withheld in full or in part after they were sent to CBP for review.  Pl. Mem. at 13–14.  But those withholdings were explained in the declaration of Shari Suzuki, a FOIA appeals officer at CBP, who states that the pages were withheld under exemptions 5, 6, 7(C), and 7(E) and provides the categories of information that were withheld under each exemption.  Suzuki Decl. ¶¶ 14–33.  For instance, and as discussed in detail above, Suzuki's declaration explains that CBP withheld under Exemption 5 the handwritten notes of a CBP officer who questioned Touarsi when he was returning from abroad, id.  ¶ 17, and withheld under Exemption 7(C) "government fax and phone

---

[5]  Touarsi claims that because several of the produced documents are labeled "Routine," the law enforcement techniques that were withheld must have been routine and therefore are not protected.  Pl. Mem. at 29.  The FBI explains, however, that this document label is not a description of the law enforcement techniques that may have been used as part of an investigation but instead identifies that the particular report is not time-sensitive.  Second Hardy Decl. ¶ 10.

numbers, the names of government employees, [and] a CBP employee's social security number," among other information, id. ¶ 26.  The Suzuki declaration thus supports the withholding of the 116 pages at issue.

        H.  Public Domain

    "Under [the] public domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." Cottone v. Reno, 193 F.3d 550, 554 (D.C. Cir. 1999) (citing Niagara Mohawk Power Corp. v. U.S. Dep't of Energy, 169 F.3d 16, 19 (D.C. Cir. 1999)).  "[A] plaintiff asserting that information has been previously disclosed bears the initial burden of pointing to specific information in the public domain that duplicates that being withheld."  Public Citizen v. U.S. Dep't of State, 11 F.3d 198, 201 (D.C. Cir. 1993) (citing Afshar v. U.S. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).   For an item to be in the public domain, it must be "officially acknowledged," meaning (1) "the information requested must be as specific as the information previously released;" (2) "the information requested must match the information previously disclosed;" and (3) "the information requested must already have been made public through an official and documented disclosure." Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990).

    Touarsi contends that DOJ must release the names of other "suspects in the suspected plot which lead to Plaintiff's detention" because they were mentioned in newspaper articles.  Pl. Mem. at 14.  Touarsi does not provide these newspaper articles, describe them, or otherwise demonstrate that the suspects' names have been officially acknowledged by the government.  Accordingly, he has not met his burden to point to specific information to which the public domain exemption applies.

I.   Duty to Segregate

The government is required to disclose any reasonably segregable portions of documents containing withheld information.  Mead Data Central, Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  Touarsi contends the FBI has not shown that it reasonably segregated non-exempt material because it only provides Hardy's declaration that the Bureau reviewed the documents page-by-page and released segregable, non-exempt information.  Pl. Mem. at 29–30.  But similarly detailed declarations providing that an agency conducted a page-by-page search are regularly accepted in this Circuit.  See, e.g., Johnson v. Executive Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002) (segregability requirement is met by an "affidavit indicating that an agency official conducted a review of each document and determined that the documents did not contain segregable information"); Island Film, S.A. v. U.S. Dep't of the Treasury, 869 F. Supp. 2d 123, 139 (D.D.C. 2012) (accepting similarly worded agency declaration).  Accordingly, the Hardy declaration is sufficient to satisfy the Bureau's obligation to demonstrate that it reasonably segregated all non-exempt information.

Touarsi also contends that the FBI is obligated to segregate and release non-exempt words or phrases that are meaningless outside of the surrounding withholdings.  Pl. Mem. at 30.  It is settled law, however, that an agency need not segregate and disclose "'disjointed words, phrases, or even sentences which taken separately or together have minimal or no informational content.'"  Schoenman v. FBI, 763 F. Supp. 2d 173, 202 (D.D.C. 2011) (quoting Mead Data Central, 566 F.2d at 261 n.55).

J.   Record Expungement

Touarsi also asks the Court to expunge government records regarding him pursuant to the Court's equitable powers.  Pl. Mem. at 31–32.  The Court declines to do so.  Compelling disclosure is the only explicitly available remedy under FOIA, 5 U.S.C. § 552(a)(4)(B), and Touarsi cites no

case where a court has expunged records as a remedy for the government's misapplication of FOIA exemptions.[6]   Ordering expungement, moreover, would be inappropriate given that the Court does not analyze the content of the records requested in a FOIA action other than to determine whether material is properly withheld under the statute's specifically enumerated exemptions.   And even if record expungement could be appropriate in some circumstance, Touarsi has not demonstrated that the government unlawfully withheld the records challenged here.

### K.  Attorney's Fees

Finally, Touarsi requests attorney's fees because DOJ apparently did not search an electronic surveillance database in response to Touarsi's FOIA request until after he filed suit.  Pl. Mem. at 33.  The Court will deny this request.  A plaintiff may not recover attorney's fees in a FOIA action merely because the agency released additional documents after the plaintiff filed a complaint in federal court.  Weisberg v. DOJ, 745 F.2d 1476, 1496 (D.C. Cir. 1984).  Moreover, Touarsi has not demonstrated that he has "substantially prevailed" in this litigation more generally—as is required to obtain attorney's fees under FOIA—because he has not obtained a "judicial order," "enforceable written agreement or consent decree," or a "voluntary or unilateral change in position by the agency."  5 U.S.C. §§ 552(a)(4)(E)(i)–(ii).

### IV.    Conclusion

For the foregoing reasons, the Court will grant the government's Motion for Summary Judgment.  An Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  ___January 23, 2015_____

---

[6]  While Touarsi is correct that the Privacy Act lists record modification as an available remedy, 5 U.S.C. § 552a(g)(2)(A), he has not brought any claim under that Act.